**In re URANIUM ANTITRUST LITIGATION.**

**In re TENNESSEE VALLEY AUTHORITY URANIUM ANTITRUST LITIGATION.**

MDL No. 342–A.

United States District Court,
N.D. Illinois, E.D.

Feb. 22, 1983.

Charles W. Van Beke, Asst. Gen. Counsel, T.V.A., Knoxville, Tenn., for plaintiff.

Clarence O. Redman, Keck, Mahin & Cate, Chicago, Ill., Latham & Watkins, Los Angeles, Cal., for defendant.

## MEMORANDUM ORDER

PRENTICE H. MARSHALL, District Judge.

Defendants Gulf Oil Corporation and Gulf Minerals Canada, Ltd. ("Gulf") have moved for certification of our order denying their motion for partial summary judgment under *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707

(1977), see In re Uranium Antitrust Litigation, 552 F.Supp. 518 (N.D.Ill.1982), to the United States Court of Appeals for the Seventh Circuit, pursuant to 28 U.S.C. § 1292(b) (1976).

Before addressing the merits of the motion itself, some preliminary comments on the arguments Gulf makes in the motion for certification and supporting memoranda are in order.

First, Gulf contends that this court misanalyzed the relevant markets when it stated that only one market was involved in this case. See 552 F.Supp. at 523 n. 8. Gulf now contends that there are two markets, the foreign and domestic markets for uranium. Therefore, Gulf argues, for plaintiff Tennessee Valley Authority ("TVA") to recover, it must trace the impact of the uranium cartel in the foreign market on the domestic market, where TVA made its purchases. That sort of tracing between markets, Gulf argues, poses insurmountable problems under the interpretation of Illinois Brick found in Reading Industries, Inc. v. Kennecott Copper Corp., 631 F.2d 10 (2d Cir.1980), cert. denied, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981).

Our assumption that only one market was involved in this case rested on what we take to be a central premise of TVA's case: that despite the Atomic Energy Commission's de facto embargo on the importation of uranium, by the time period relevant to this case the uranium cartel was willing and able to sell uranium to domestic consumers such as TVA. If it were not able to sell to TVA because of the embargo, then, we take it, the parties agree that the cartel's refusal to deal with TVA was not the result of anticompetitive conduct and is not actionable under the antitrust laws. However, if the cartel were willing and able to sell to TVA, then it was in the domestic market, since the market includes the output of all sellers to which TVA could practicably have turned in order to obtain uranium. See, e.g., United States v. Connecticut National Bank, 418 U.S. 656, 666–68, 94 S.Ct. 2788, 2794–96, 41 L.Ed.2d 1016 (1974); United States v. Philadelphia National Bank, 374 U.S. 321, 357–60, 83 S.Ct. 1715, 1738–40, 10 L.Ed.2d 915 (1963); Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327–28, 81 S.Ct. 623, 627–29, 5 L.Ed.2d 580 (1961); Standard Oil Co. v. United States, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949). See also, e.g., II P. Areeda & D. Turner, Antitrust Law ¶ 523 (1978); Landes & Posner, Market Power in Antitrust Cases, 94 Harv.L.Rev. 937, 963–68, 980–81 (1981).

However, it hardly matters whether there are two markets in this case. Even if there are, this case is not Kennecott Copper. The parties agree that TVA may recover for overcharges paid to members of the cartel in the domestic market. However, to recover for these charges, TVA must prove what price would have been charged but for the existence of the anticompetitive conduct allegedly engaged in by the cartel. To do this, TVA must account for the effects of the foreign market on the prices that cartel members would have charged in the domestic market, if Gulf is correct that there is a relationship between the pricing structure in the foreign market and that in the domestic market. Thus, even for these concededly actionable purchases, TVA must trace between the foreign and domestic markets. The problems posed by the overcharges paid to nonmembers of the cartel are no greater: there too we know what price they actually charged, and can determine what price they would have charged by the same sort of analysis as is used for the concededly actionable purchases from cartel members. See generally 552 F.Supp. at 524–25. Thus, here it will not be necessary to determine how overcharges are passed on to indirect purchasers, as it was in Illinois Brick, or to determine how undercharges in one product market affected the demand and hence prices in another product market, as it was in Kennecott Copper. Even if there are two markets in this case, the tracing problems posed by TVA's purchases from nonmembers of the cartel are not significantly different from the problems posed in recovering overcharges paid directly to members

of the cartel. The "price umbrella" theory used by TVA, that the cartel created an umbrella that allowed even nonmembers to raise their prices above competitive levels, is much simpler than the complex "pass-through" theories that were rejected in *Illinois Brick* and *Kennecott Copper.*

Second, Gulf urges us to take note of *California v. Standard Oil Co.,* 691 F.2d 1335 (9th Cir.1982) (*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*), which was decided after our order was issued in this case, and which, Gulf contends, reaches a different result than we did.

The simple answer to Gulf is that it has misread the *Petroleum Products* case. There, the court noted that courts had disagreed as to the correct answer to the problem we faced, *see* 691 F.2d at 1339–40, but stated that it

> need not decide, however, whether, in a situation involving a single level of distribution, a single class of direct purchasers from non-conspiring competitors of the defendants can assert claims for damages against price-fixing defendants under an umbrella theory. In the case before us, the umbrella claimants purchased gasoline from marketers who, in turn, purchased their gasoline from independent refiners. These independent refiners manufactured a percentage of the independent marketers' supply and brokered the remainder of the marketers' supply from major refiners, *i.e.,* the defendants.

*Id.* at 1340.

Thus, *Petroleum Products* involved plaintiffs that, unlike TVA, were not direct purchasers who had directly paid the alleged overcharges. As a result, "the overcharge to plaintiffs may simply result from a pass-on of the original unlawfully inflated price. If so, it falls squarely within *Illinois Brick.*" *Id.* Moreover, since the case did not involve direct purchasers, it involved the risk of double recovery and the difficulty in tracing the effect of a pricing decision through various distribution chains which were condemned in *Illinois Brick. See id.* at 1340–41. This case involves a direct purchaser,

presenting the very issue the *Petroleum Products* court expressly declined to decide. None of the problems of proof noted in that case are present here. *Petroleum Products* simply is not pertinent to the case at hand.

The condition of our calendar is such that we will be unable to try this case (which has been transferred here with the consent of the parties pursuant to 28 U.S.C. § 1404(a) (1976)) until October, 1983. In these circumstances an interlocutory appeal at this time will not result in a delay of the ultimate resolution of the case. And a certified interlocutory appeal under 28 U.S.C. § 1292(b) (1976) of the issue of measure of damages may materially advance the ultimate resolution of the litigation because the proper measure of damages is always a controlling question of law in cases of this kind.

While we believe that we have fairly considered and properly rejected defendants' contentions advanced under *Illinois Brick* and *Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573 (3d Cir.1979), we recognize that there is substantial ground for difference of opinion on the subject. Accordingly, we certify for immediate appeal our order of September 24, 1982 denying defendants' motion for partial summary judgment as it decides a controlling question of law as to which there is substantial ground for disagreement and an immediate appeal therefrom may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b).